UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NORTHVILLE VENTURE PARTNERS, LLC,

                Plaintiff/Appellant,

                                           Case No. 21-cv-10248

v.                                  Honorable Linda V. Parker

CITY OF NORTHVILLE,

                Defendant/Appellee.

_____/

## OPINION AND ORDER

      This lawsuit and administrative appeal arise from two related decisions by the City of Northville's Board of Zoning Appeals ("BZA"): (a) a November 4, 2020 decision that a covering over a portion of the rooftop terrace of property developed by Northville Venture Partners, LLC ("NVP") constituted a "roof," thus causing the property's height to exceed the maximum permitted by the City's Zoning Ordinance; and (b) a December 2, 2020 decision denying NVP's request for a variance from the height restriction.  Following these decisions, NVP filed a state-court "Claim of Appeal and Complaint" against the City of Northville (hereafter "City"), asserting the following counts: (I) "Claim of Appeal" pursuant to the Michigan Zoning Enabling Act, Mich. Comp. Laws §§ 125.3605-.3607; (II) "Denial of Substantive Due Process"; and (III) "Violation of 42 U.S.C. § 1988(b) and 42 U.S.C. § 1983[.]"  (ECF No. 1-1.)  The City removed the action to federal

court based on federal question and supplemental jurisdiction, 28 U.S.C. §§ 1331, and 1367(a).  (ECF No. 1.)

The matter is presently before the Court on NVP's administrative appeal, which is fully briefed.  (ECF Nos. 47, 52, & 56.)  It also is before the Court on the City's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, which also is fully briefed.  (ECF Nos. 48, 54, 57.)  Finding the facts and legal arguments adequately presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I.     Factual and Procedural Background

In 2017, NVP sought approval from the City to build two luxury townhouse-style residential buildings on North Center Street in Downtown Northville.  (*See e.g.*, ECF No. 6-4 at PageID. 178)  Each of the buildings would be three stories and contain eight residential units.  (*Id.*)  According to the original architectural plans submitted by NVP, roof-top decks/patios were contemplated above each building's third floor.  (*Id.* at PageID. 186, 192; ECF No. 54-17.)  The original plans show a trellis covering over a portion of the roof-top decks.  (ECF No. 6-4 at PageID. 186, 192; ECF No. 54-17 at PageID. 1958-61, 1968-71.)

Mielock Associates, Inc. drew the original architectural plans for the project.  (ECF No. 54-17.)  Architect Robert Miller of M. Associates, a consultant to Mielock Associates, assisted with the creation of those plans.  (ECF No. 54-12 at

2

PageID. 1814.)  The City approved the plans for the project and construction ensued.  NVP hired Liongold Homes, doing business as DW Development, to construct the project.  (ECF No. 54-2 at PageID. 1514 ¶ 8.)

On April 15, 2019, Michael and Audrey Schmitt contracted with NVP to purchase units 6 and 7 of the project and combine them into a single residence.  (ECF No. 48-3.)  According to Michael Schmitt, NVP members Dewayne White and Jason Jones, and project Construction Manager Richard Kligman, the Schmitt's purchase agreement required "a covered canopy structure, in lieu of an open trellis configuration, over approximately 25% of the Residence's roof-top terrace[.]"  (ECF No. 54-2 at PageID. 1514 ¶ 15 (White Decl.); *id.* at PageID. 1518 ¶ 15 (Jones Decl.); *id.* at PageID. 1522 ¶ 16 (Kligman Decl.); *id.* at PageID. 1525-26 ¶ 6 (M. Schmitt Decl.).)  Only a portion of the purchase agreement has been introduced into the record, and that portion does not reflect this requirement.  (*See* ECF No. 48-3.)

NVP engaged Miller to prepare modified construction plans to reflect the combination of the two units, which were submitted to the City for approval on June 25, 2019 ("June 25 Plans").  (*See* ECF No. 48-5.)  The City's Building Official, Brent Strong, approved the June 25 Plans a few days later.[1]  (*See* ECF No.

---

[1] Strong in fact is an employee of Carlisle Wortman and Associates, working in its Building Department Division (also referred to as Code Enforcement Services,

54-4 at PageID. 1600; ECF No. 54-12 at PageID. 1818-19.)  According to White, Jones, and Kligman, Miller was instructed to prepare the revised plans "in strict accordance with the [purchase agreement between NVP and the Schmitts], and specifically in accordance with the Schmitts' request to combine the units and construct a modestly designed canopy terrace structure in lieu of an open trellis configuration over the roof-top terrace[.]"  (ECF No. 54-2 at PageID. 1514 ¶¶ 16-17; *id.* at PageID. 1518 ¶¶ 16-17; *id.* at PageID. 1522-23 ¶¶ 17-18.)  Miller testified, however, that the revised plans he prepared in mid-2019 (i.e., the June 25 Plans) do not reflect a solid covering over a portion of the rooftop terrace because that change was not requested until later that year.  (ECF No. 54-12 at PageID. 1831-32, 1843, 1848-49.)

According to Miller, the June 25 Plans still show the original base building, which included the trellis, as nothing was being changed from the original plans with respect to the building's exterior at that time.  (*Id.* at PageID. 1830-32, 1843. 1849.)  Miller testified that page "A301" of the June 25 Plans—the page depicting the rooftop—does not show a change from a trellis to a solid covering.  (*Id.* at PageID. 1828-29.)  Miller further testified that this change only was reflected in a

---

Inc.).  (*See* ECF No. 54-4 at PageID. 1543.)  In that capacity, Strong serves as the Building Official for the City of Northville, as well as other municipalities.  (*Id*. at PageID. 1544.)  Strong has an email address associated with Carlisle Wortman, as well as individual email addresses for each of the municipalities he serves.  (*Id*.)

separate construction bulletin, issued on January 7, 2020.  (*Id.* at PageID. 1828-30.)  Miller indicated that if the change had been proposed when he prepared the June 25 Plans, these later drawings detailing the change would have been included with those plans.  (*Id.* at PageID. 1842.)  But, Miller stated, "at the time [the June 2019] drawings were issued the discussion of changing the roof was not on the table."  (*Id.* at PageID. 1849.)

Miller's understanding of when the change from the trellis to a solid covering was made and incorporated into the construction plans is supported by email messages in July and August 2019, where the covering was still referred to as a "pergola."  (*See* ECF No. 48-7.)  It also is supported by email messages in December 2019.  (*See* ECF No. 48-8.)  Specifically, December 9 emails between Miller and Joshua Cardinal, a professional engineer, include discussions about how to engineer the closed roof structure "the owner *now* wants[.]"  (*Id.* at PageID. 1342 (emphasis added).)  Miller emailed Kligman on December 17, sharing that he had been told the day before that the Schmitts wanted the revised rooftop covering to extend out as far as possible.  (*Id.* at PageID. 1343.)  In addition to sharing concerns about the structural challenge this posed, Miller wrote:

> I am concerned that the city may not allow the roof covering to begin with, and then with making it bigger will definitely add to the concern.  I think we need to check with Brent [Strong] first on the roof, and most likely tell the client if he allows the roof they won't be able to extend it past the walls that form the kitchen area between the storage and stairs.

5

(*Id.*)

There is no indication in the record that NVP, DW Development, or anyone involved with the project then checked with Strong or other City officials about the solid covering.  Strong raised a concern about the solid covering when he was on the project site in July 2020, after it had been completed.  (ECF No. 54-4 at PageID. 1605, 1615, 1695; ECF No. 48-9.)  NVP was advised that day or the day after that permission for the modification was needed from the City's Planning Commission.  (ECF No. 48-10.)  Pursuant to the City's Zoning Ordinance, Strong had the authority to approve minor deviations to plans already approved by the Planning Commission; however, revisions that altered the basic design or rendered a building noncompliant with certain zoning standards or other specified conditions of the plan required the Planning Commission's approval.  (ECF No. 54-5 at PageID. 1579-80; *see also* ECF No. 6-9 at PageID. 413-14 § 19.11.)

Strong and Planning Consultant Sally Elimger concluded that the solid covering was a "roof."[2]  (ECF No. 54-4 at PageID. 1629; ECF No. 6-4.)  They reasoned that the Zoning Ordinance did not define "roof" or "canopy" and

---

[2] At one point, Strong and Elimger also opined that the solid covering rendered the terrace a prohibited fourth story.  (*See* ECF No. 6-4.)  Strong later changed his assessment (*see* ECF No. 6-1 at PageID. 48); however, he felt that the issue of whether it created a fourth story, requiring a separate variance, did not need to be decided as the bigger issue was the height restriction.  (*Id.*)  The BZA eventually decided to table the issue of whether the terrace now constituted a fourth story.  (*Id.* at PageID. 52-54.)

provided that undefined terms "shall have the meaning customarily assigned to them."  (ECF No. 6-4 at PageID. 215; ECF No. 6-9 at PageID. 416 § 26.01(9).)  Strong and Elmiger therefore looked to the Oxford Dictionary for the terms' customary meanings.  (ECF No. 6-4 at PageID. 215.)

Oxford Dictionary defined the terms as follows:

**Roof**:  the structure forming the upper covering of a building or vehicle.

**Canopy**: a projection or shelter that resembles a roof.

(*Id.*)  Finding that the solid covering was a "structure" (a term defined in the Zoning Ordinance) because it was composed of parts (rafters, beams, etc…), Strong and Elmiger concluded that the solid covering was a roof.  (*Id.*)

As the City's Zoning Ordinance defined "Building Height" to be the vertical distance from the grade plane . . . to the highest point of the flat roof" (ECF No. 6-9 at PageID. 421 ¶ 28), Strong and Elimger also concluded that the calculation of the building's height now needed to include the distance to the top of the covering.  (ECF No. 54-4 at PageID. 1629; ECF No. 604).  This resulted in the building height exceeding the 42-foot maximum set forth in the City's Zoning Ordinance by 5.67 feet.  (*See* ECF No. 6-4 at PageID. 217.)

Based on these assessments, a stop work order was issued.  NVP applied for relief with the BZA, seeking an interpretation of the term "roof" and, if necessary,

a 5.67-foot variance from the maximum building height allowance.  (*See* ECF No. 6-1.)

In its application and presentation to the BZA, NVP asserted that the structure was a "canopy" not a "roof," and that the June 25 Plans submitted to and approved by the City include the covered structure which had been built.  (*Id*. at PageID. 43-44; *see also* ECF No. 6-4.)  NVP also argued that the Oxford Dictionary was an inappropriate source to define terms used in zoning and building.  (ECF No. 6-1 at PageID. 44-45.)  NVP urged the BZA to refer instead to the Michigan Residential Code.  (*Id.*)

At a hearing on November 4, 2020, the BZA concluded that the structure was a roof and, thus, its height needed to be included when calculating the building height.  (*See* ECF No. 6-1.)  At a subsequent hearing on December 2, 2020, the BZA denied NVP's request for a variance.  As indicated earlier, this appeal and lawsuit followed.

## II.    Applicable Standards

### A.    Summary Judgment

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252. The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

### B.    Administrative Appeals

Michigan Court Rule 7.122 provides the process for appealing zoning ordinance determinations, providing that the applicable standard of review is set forth in Michigan Compiled Laws § 125.3606. Mich. Ct. R. 7.22(G)(1)(a). Section 125.3606 reads, in relevant part:

> (1) Any party aggrieved by a decision of the zoning board of appeals may appeal to the circuit court for the county in which the property is located. The circuit court shall review the record and decision to ensure that the decision meets all of the following requirements:

9

(a) Complies with the constitution and laws of the state.

(b) Is based upon proper procedure.
(c) Is supported by competent, material, and substantial evidence on the record.

(d) Represents the reasonable exercise of discretion granted by law to the zoning board of appeals.

Mich. Comp. Laws § 125.3606(1); *see also City of Detroit v. City of Detroit Bd. of Zoning Appeals*, 926 N.W.2d 311, 314 (Mich. Ct. App. 2018) (citing *Janssen v. Holland Charter Twp. Zoning Bd. of Appeals*, 651 N.W.2d 464, 467 (Mich. Ct. App. 2002)). "Substantial evidence is any evidence that reasonable minds would accept as adequate to support the decision; it is more than a mere scintilla of evidence but may be less than a preponderance of the evidence." *Barak v. Drain Comm'r for Oakland Cnty.*, 633 N.W.2d 489, 492 (Mich. Ct. App. 2001) (citing *Korzowski v. Pollack Indus.*, 539 N.W.2d 741, 744 (Mich. Ct. App. 1995)).

A court's review of a zoning decision "is not de novo and the court is not permitted to draw its own conclusions from the evidence presented to the administrative body." *Edw. C. Levy Co. v. Marine City Zoning Bd. of Appeals*, 810 N.W.2d 621, 626 (Mich. Ct. App. 2011) (citing *THM, Ltd. v. Comm'r of Ins.*, 440 N.W.2d 85, 87 (Mich. Ct. App. 1989)). The agency's findings of fact must be given deference. *Id.* (citing *THM*, 440 N.W.2d at 87) (providing that "strict deference" must be given to administrative decisions). "When there is substantial

evidence, a reviewing court must not substitute its discretion for that of the administrative tribunal even if the court might have reached a different result." *Id.* (citing *Black v. Dep't of Soc. Servs.*, 489 N.W.2d 493, 494 (Mich. Ct. App. 1992)). "A court may not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record." *Id.* (citing *In re Payne*, 514 N.W.2d 121, 128 (Mich. 1994)).

### III.   Applicable Law & Analysis

#### A.   NVP's "Claims"

In Count III of its Complaint, NVP asserts an independent cause of action under §§ 1983 and 1988.  But NVP acknowledges in its response to the City's summary judgment motion that these statutes do not provide an independent cause of action but a source of remedy for a violation of NVP's constitutional rights. Those constitutional violations are asserted in Count II of the Complaint.

Specifically, in Count II, NVP asserts violations of its Fifth and Fourteenth Amendment rights.  NVP concedes in its response brief, however, that the Fifth Amendment's Due Process Clause circumscribes the actions of only the federal government.  Thus, the Court discusses below only what remains of NVP's claims:

its Fourteenth Amendment substantive due process claim and its administrative

appeal.[3]

## B.     Fourteenth Amendment - Substantive Due Process

The Fourteenth Amendment's Substantive Due Process Clause places

limitations on the government's ability to deprive individuals of life, liberty, or

property "regardless of the adequacy of the procedures employed." *Johnson v. City*

*of Saginaw*, 980 F.3d 497, 513 (2020) (quotation marks and citations omitted).  A

plaintiff claiming a substantive due process violation must first show that "the

interest at stake is a protected liberty or property interest under the Fourteenth

Amendment." *Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001).

"Only after identifying such a right do[es a court] continue to consider whether the

deprivation of that interest contravened the notions of due process." *Id.* (citations

omitted).

### 1.     Whether NVP Had a Protected Property Interest

---

[3] NVP also refers to the Michigan Constitution in its Complaint.  (*See* ECF No. 1-1 at PageID 14, 19, 21, ¶¶ 6, 31, 35, 38.)  The City argued in its summary judgment motion that any claims under the State's Constitution fail as a matter of law.  NVP did not respond to the City's argument.  Therefore, any claim asserted under the Michigan Constitution is waived.  *See Indeck v. Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000) (quoting *United States v.* Layne, 192 F.3d 556, 566-67 (6th Cir. 1999), *cert. denied* 529 U.S. 1029 (2000)) (finding an issue not raised at all waived "[b]ecause even 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

The Sixth Circuit has held in the context presented here that a plaintiff has a protectable property right supporting a substantive due process claim only if the plaintiff has a "'*legitimate* claim of entitlement' or a '*justifiable* expectation' in the approval of [its] plan.'" *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (1992) (emphasis added) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) and *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983)).  Property owners have a protected property interest in developing their property in accordance with plans approved by the relevant municipality.  *See Hearns Concrete Constr. Co. v. City of Ypsilanti*, 241 F. Supp. 2d 803, 812 (E.D. Mich. 2003) (citing *Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627, 642 (6th Cir. 2001)); *see also Dorr v. City of Ecorse*, 305 F. App'x 270, 275 (6th Cir. 2008) (citing *Dingeman Advert., Inc. v. Algoma Twp.*, 223 N.W.2d 689, 691 (Mich. 1974)) ("Under Michigan law, it is well established that possession of a valid building permit coupled with substantial reliance thereon, including actual construction, will bestow vested property rights to a non-conforming structure.").

NVP contends that its plans reflecting a solid covering over a portion of the rooftop terrace of the combined units were approved by the City in June 2019, and that NVP subsequently erected the covering in conformity with those plans.  The City maintains that the June 25 Plans which were submitted and approved do not reflect this modification to the original plans.  For the reasons discussed below, the

Court finds that NVP did not have a legitimate or justifiable reason to believe that the City had approved the construction of a solid covering in lieu of a trellis over the rooftop terrace.

According to the declarations of Michael Schmitt and NVP's representatives (White, Jones, and Kligman), the solid covering in lieu of the trellis is reflected on the June 25 Plans.  However, Miller, who prepared those plans, unequivocally testified that they do not reflect the solid element.  Instead, Miller testified, the June 25 Plans show the original base building, which included the trellis, as nothing was changing on the base building from the original plans at that time.

Miller's testimony that a solid covering had not been discussed before the June 25 Plans were submitted to the City is supported by messages between Miller and the project engineer and between Miller and the project construction manager. Miller's warning to Kligman in mid-December that the City might not allow the solid covering clearly signals that the City had not yet approved plans reflecting such a change.  It further suggests that NVP was aware that the City's approval was still needed.  This is consistent with how the City viewed the June 25 Plans, as well as the plans themselves.

Nothing on the June 25 Plans highlights or identifies a change from the trellis contemplated in the original drawings to a solid covering.  This is clear when one compares the June 25 Plans to the subsequent construction bulletin detailing

14

the proposed change, which was not issued until January 2020.  The subjective

intent or belief of NVP's representatives and the Schmitts with respect to what the

June 25 Plans should or do reflect do not create an issue of fact as to what those

plans in fact show.  A property owner cannot submit a revised plan that fails to

reflect or identify modifications and then claim a "legitimate claim of entitlement"

or "justifiable expectation" to those modifications if the plan is approved.  And this

is even more true where the only individuals claiming that the revised plans reflect

the modification are the property owners.  "In order to have a property interest in a

benefit, a person must have more than a desire for it or unilateral expectation of

it[.]"  *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008) (citing

*R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 435 (6th Cir. 2005)).

For these reasons, NVP cannot satisfy the first element of its substantive due

process claim.  But even if NVP had a protected property interest in constructing a

solid covering over the rooftop terrace, its claim fails under the second element.

### 2.     Whether the City's Decisions Contravened Due Process

To contravene due process in the context of zoning regulations, the

constitutionally protected interest must be "deprived through arbitrary and

capricious action."  *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th

Cir. 2012) (quoting *Braun*, 519 F.3d at 573).  But this means "arbitrary and

capricious action in the *strict* sense."  *Pearson v. City of Grand Blanc*, 961 F.2d

15

1211, 1221 (6th Cir. 1992) (internal quotation marks and citation omitted).  It is

action that "is not supportable on any rational basis or is willful and unreasoning

action, without consideration and in disregard of the facts or circumstances of the

case."  *Id.* (cleaned up).  In other words, "a court should 'not interfere with local

zoning decisions unless the locality's action has no foundation in reason and is a

mere arbitrary or irrational exercise of power having no substantial relation to the

public health, the public morals, the public safety[,] or the public welfare.'"

*Tollbrook, LLC v. City of Troy*, 774 F. App'x 929, 933 (6th Cir. 2019) (quoting

*Braun*, 519 F.3d at 574).

The scope of review of a municipality's zoning decision under substantive

due process is "something far different than" the scope of review for an

administrative appeal.  *Pearson*, 961 F.2d at 1221.  Under substantive due process,

the court's review "is extremely narrow."  *Id.*  "Otherwise," the Sixth Circuit has

explained, "we risk subjecting every state administrative decision to federal court

review.  And that would turn our system of separated powers and dual sovereignty

on its head."  *Johnson v. Morales*, 946 F.3d 911, 933 n.14 (6th Cir. 2020)

(Nalbandian, J., dissenting); *see also Pearson*, 961 F.2d at 1222 (quoting *Regents*

*of Univ. of Mich. v. Ewing*, 474 U.S. 214, 514 (1985)) (ellipsis removed)

("Federalism and comity demand a reluctance by federal courts 'to trench on the

prerogatives of state and local institutions'"); *Andreano v. City of Westlake*, 136 F.

16

App'x 865, 872 (6th Cir. 2005) (quoting *Pearson*, 961 F.2d at 1222) (observing that "the vast majority of such attacks [i.e., substantive due process attacks on state administrative actions] may readily be disposed of on summary judgment . . . thus keeping interference by federal courts with local government to a salutary minimum"). Thus, "it is extremely rare for a federal court properly to vitiate the action of a state administrative agency as a violation of substantive due process." *Pearson*, 961 F.2d at 1222; *see also Andreano*, 136 F. App'x at 872 (6th Cir. 2005) (quoting *Pearson*, 961 F.2d at 1222).

Finally, "the application of this deferential standard of review is a matter of law for the court." *Pearson*, 961 F.2d at 1222. "Otherwise," the Sixth Circuit explained, "federal juries would sit as local boards of zoning appeals." *Id*.

NVP advances only one argument in support of its contention that the BZA acted arbitrarily and capriciously: that the BZA should not have looked to the dictionary to conclude that the covering was a "roof" but should have looked to the Michigan Residential Code and found it to be a "canopy." (*See* ECF No. 47 at PageID. 1201-02.) Notably, NVP does not address this second element of its substantive due process claim in response to the City's summary judgment. Instead, NVP relies on its brief with respect to its administrative appeal. But as just discussed, the two challenges are subject to different scopes of review. In any

event, the BZA did not arbitrarily and capriciously conclude that the covering was a roof.

The Zoning Ordinance does not define the term "roof." (*See* ECF No. 6-3.) However, the Zoning Ordinance expressly states that undefined terms "shall have the meaning customarily assigned to them." (*Id.* at PageID. 119 § 26.01(9).) Michigan state and federal courts find it appropriate to consult a dictionary to find the customary meaning of undefined terms in a statute or ordinance. *See, e.g., Nylen v. City of Grand Rapids*, 475 F. Supp. 3d 744, 752 (W.D. Mich. 2019) (citing *McCormick v. Carrier*, 795 N.W.2d 517, 525 (Mich. 2010)); *Whitman v. Galien Twp.*, 808 N.W.2d 9, 16 (Mich. Ct. App. 2010) (citing *Risko v. Grand Haven Charter Twp. Zoning Bd. of Appeals*, 773 N.W.2d 730, 735 (Mich. Ct. App. 2009)); *Robinson v. Ford Motor Co.*, 744 N.W.2d 363, 367 (Mich. Ct. App. 2007) (citing *Halloran v. Bhan*, 683 N.W.2d 129, 132 (Mich. 2004)); *Stanton v. City of Battle Creek*, 647 N.W.2d 508, 512 (Mich. 2002) (citing *Horace v. City of Pontiac*, 575 N.W.2d 762 (Mich. 1998)).

NVP offers no authority to support its argument that the City had to rely on the Michigan Residential Code before turning to the dictionary or that the Michigan Residential Code is the only valid point of reference. In any event, the Michigan Residential Code does not define the term "roof," either. While the code purportedly defines "story," "rooftop structure," "roof assembly," and "canopy",

those definitions do not compel the conclusion that the covering at issue is not a

roof.[4]  (*See* ECF No. 6-4 at PageID. 229); *see also*

https://up.codes/viewer/michigan/mi-residential-code-2015, Sections R202.

Notably, the version of the City's Zoning Ordinance in effect when the BZA made

the decisions at issue referred to canopies only in the context of trees and

"membrane storage structures," which were defined as "consist[ing] of a frame[]

that is covered with a plastic, fabric, canvas, or similar non-permanent

material . . ."—i.e., not the structure at issue here.[5]  (ECF No. 603 at PageID. 90,

99, 135.)

---

[4] The code includes the following definitions:
> "**Story.**  That portion of a building included between the upper surface of a floor and the upper surface of the floor or roof next above."
> "**Rooftop Structure.**  An enclosed structure on or above the roof of any part of a building."
> "**Roof Assembly.**  A system designed to provide weather protection and resistance to design loads. The system consists of a roof covering and roof deck or a single component serving as both the roof covering and the roof deck. A roof assembly includes the roof deck, vapor retarder, substrate or thermal barrier, insulation, vapor retarder [sic], and roof covering."

*See* https://up.codes/viewer/michigan/mi-residential-code-2015, Sections R202. The Court did not locate a definition for "canopy," however, NVP indicates that the term is defined as "[a] permanent structure or architectural projection of rigid construction over which a covering is attached that provides weather protection, identity or decoration. A canopy is permitted to be structurally independent or supported by attachment to a building on one or more sides.  (ECF No. 6-4 at PageID. 229.)

[5] A more recent version of the City's Zoning Ordinance defines "canopy" as "[a]

NVP repeatedly argues that a municipality must accord great weight to its past construction of undefined or ambiguous terms and cites a number of cases supporting this rule.  (*See, e.g.*, ECF No. 47 at PageID. 1209 (citing *Sinelli v. Birmingham Bd. of Zoning Appeals*, 408 N.W.2d 412, 414 (Mich. Ct. App. 1987)); ECF No. 47 at PageID. 1210 (citing *Kalkman v. City of Douglas*, No. 306051, 2012 WL 4215834, at *3 (Mich. Ct. App. Sept. 20, 2012))); *see also Macenas v. Vill. of Michiana*, 446 N.W.2d 102, 110 (Mich. 1989) (citing *Sinelli*, 408 N.W.2d at 414). Yet, NVP offers no evidence reflecting the City's past construction of the term roof or of its past assessment of structures or coverings similar to the one at issue.  The City's approval of the June 2019 Plans is not evidence of a past practice as the City did not view those plans as proposing a change from the trellis covering over the rooftop terrace.

For these reasons, NVP fails to show that the City arbitrarily and capriciously concluded that the covered structure constituted a "roof," resulting in the building's height exceeding that permitted under the zoning ordinance and necessitating a variance.

### C.    Administrative Appeal

---

rigid multi-sided structure covered with opaque fabric, metal or other opaque material and supported by a building at one or more points or extremities. May be illuminated by means of external sources."  *See* https://cdnsm5-posted.civiclive.com .

As set forth earlier, this Court must accord strict deference to the BZA's decisions unless NVP demonstrates that the decisions failed to comply with the law, were based on an improper procedure, were not supported by competent, material, and substantial record evidence, or represented an unreasonable exercise of discretion granted by law to the BZA.  *See Janssen*, 651 N.W.2d at 467; Mich. Comp. Laws § 125.3606(1).  NVP has failed to make this showing.

NVP's sole argument to support its administrative appeal is the one just discussed—that is, that the BZA should not have looked to the dictionary to define the term "roof" but should have looked to the Michigan Residential Code and found the structure to be a "canopy."  But as discussed, "roof" is not defined in the City's Zoning Ordinance and the ordinary meaning of the term applies.  In that instance, the City reasonably relied on the dictionary definition.

A "roof" is defined as a "structure forming the upper covering of a building," and the BZA noted that is what the structure at issue did.  As members of the BZA reasoned, the structure had "significant mass on top of this building" and, unlike the previously approved lattices, no longer allowed air or light to flow through it.  One board member rejected use of the term "canopy" because it was "not a key term in the ordinance."  And the BZA rejected the argument that only enclosed roof structures can have a roof.

21

NVP asserts no argument for why the City's subsequent decision to deny it a variance should be reversed.  As such, its appeal of that decision is waived.  *See Indeck v. Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000) (quoting *United States v. Layne*, 192 F.3d 556, 566-67 (6th Cir. 1999), *cert. denied* 529 U.S. 1029 (2000)) (finding an issue not raised at all waived "[b]ecause even 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

## IV.    Conclusion

NVP acknowledges that its §§ 1983 and 1988 claims (Count III), to the extent not tethered to a federal constitutional provision, fail to state an independent cause of action.  NVP further acknowledges that its Fifth Amendment claim is subject to dismissal.  NVP has waived any claim under the Michigan Constitution by failing to address the City's arguments for dismissing that claim.

Finally, for the reasons discussed, the Court holds that the City is entitled to summary judgment with respect to NVP's substantive due process claim (Count II).  NVP fails to show that the City's zoning decisions should be reversed.

Accordingly,

**IT IS ORDERED** that the City of Northville's motion for summary judgment (ECF No. 48) is **GRANTED**.

**IT IS FURTHER ORDERED** that Northville Venture Partners, LLC's

appeal of the Zoning Board of Appeals' November 4 and December 2, 2020

decisions is denied, and those decisions are **AFFIRMED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: November 7, 2024

23